UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ARTHUR PRUITT,

                    Petitioner,                                    ORDER

         -against-                                                 08-CV-01495 (SJF)
                                                                   **FILED**
WILLIAM BROWN, Superintendent of State Prison                      IN CLERK'S OFFICE
                                                                   U S. DISTRICT COURT E.D.N.Y

                    Respondent.                                    ★   AUG 0 9 2011   ★
------------------------------------------------------------------X
FEUERSTEIN, United States District Judge

                                                                   LONG ISLAND OFFICE

     On March 14, 2001, a judgment of conviction was entered against petitioner, Arthur Pruitt

("petitioner"), in the County Court of the State of New York, County of Nassau (DeReggi, J.),

upon a jury verdict finding him guilty of rape in the first degree (N.Y. Penal Law § 130.35(1)) and

sexual abuse in the first degree (N.Y. Penal Law § 130.65(1)), and imposition of sentence. On

June 27, 2008, petitioner filed a petition seeking a writ of habeas corpus pursuant to 28 U.S.C. §

2254. For the reasons set forth herein, the petition is denied and the proceeding is dismissed.


I.      Background

        A.      Factual Background

                1.      The People's Case

     L.D., petitioner's stepdaughter, testified that in the evening of May 3, 1999, when she was

seventeen (17) years old, she had an argument with petitioner. (Tr. 377). Around eleven o'clock

(11:00) that evening, L.D. awoke to find petitioner in her bedroom, at which time they resumed

1

arguing. (Tr. 349-350, 356). When L.D. threatened to call the police if petitioner did not leave her bedroom, petitioner ripped the telephone cord out of the wall and L.D. threw the receiver at him and hit him with the phone. (Id.) They then started "rassling" and petitioner threw L.D. onto the floor, choked her, said that "he could do what he wanted" to her and closed the door. (Tr. 351). Petitioner put his knee on L.D.'s chest and pulled down her underwear as L.D. yelled for him to stop and told him that she had "all types of diseases" and was menstruating. (Tr. 352, 387). According to L.D., she told petitioner "anything [she] could think of, to make him stop." (Tr. 352). Nonetheless, petitioner inserted his penis into L.D.'s vagina and had sexual intercourse with her. (Tr. 353). Afterwards, petitioner wiped himself with a tissue, which he threw in the garbage, and left. (Tr. 354).

Thereafter, L.D. left her home, walked three (3) blocks to the house of her neighbor, Dionne Green ("Green"), and told Green everything that had happened with petitioner. (L.D.: Tr. 357; Green: Tr. 517-519). According to Green, the first thing she did when L.D. arrived at her house was to give her water because her voice was harsh and scratchy. (Tr. 519). When L.D. refused to call the police, Green called her pastor and spoke with the pastor's wife, Rosalind Colander ("Rosalind"). (L.D.: Tr. 358; Green: Tr. 519). L.D. then told Rosalind everything that had happened and asked Rosalind to pick her up from Green's house. (L.D.: Tr. 359; Rosalind: Tr. 520-523). According to Rosalind, when she arrived at Green's home, L.D. was crying. (Tr. 523).

Between one o'clock (1:00) and one thirty (1:30) the next morning, L.D. called her mother, Clarissa Pruitt ("Clarissa"), and told her that petitioner had raped her. (L.D.: Tr. 359; Clarissa: Tr. 611). According to Clarissa, L.D.'s voice was very hoarse. (Tr. 611).

2

L.D. testified that petitioner's penis was not circumcised, (Tr. 370), which was corroborated by Clarissa, who had been married to petitioner for five (5) years prior to the rape. (Tr. 611).

Rosalind took L.D. to Franklin General Hospital ("the hospital"). (L.D.: Tr. 360; Rosalind: Tr. 524). Deborah Scott ("Scott"), a registered nurse at the hospital, (Tr. 504), testified that she observed a "burn abrasion type mark" on L.D.'s upper chest area, by her throat, when she arrived at the hospital. (Tr. 508). Photographs taken of L.D.'s body depicted an abrasion on her upper chest and marks on her neck and arm. (Tr. 364-365).

Doctor Marc Berger ("Berger"), the obstetrician/gynecologist on call at the hospital on May 4, 1999, performed a physical and pelvic examination on L.D. (Berger: Tr. 414-416; L.D.: 360). Berger testified that during his examination, he observed an abrasion and swelling on the left side of L.D.'s neck. (Tr. 424). Blood samples and vaginal/penile DNA were also collected from L.D., (Berger: Tr. 423, 431; Anna Gryl: Tr. 497-498; Detective Anthony Sgueglia: Tr. 621), which Detective Anthony Sgueglia, of the Nassau County Police Department ("NCPD") Sex Crimes Squad, turned into headquarters. (Tr. 622-623).

Police Officer Joseph Sortino ("Sortino") testified that on May 4, 1999, at approximately five o'clock (5:00) in the morning, he responded to a call from headquarters to appear at the hospital. (Tr. 410). According to Sortino, he interviewed L.D. at the hospital and prepared a "32B" domestic incident report of that interview, but that report was subsequently lost. (Tr. 413). Police Officer Beth McKenzie ("McKenzie") also interviewed L.D. and testified that she provided a domestic incident report of that interview to Sortino. (Tr. 410). Sergeant Lucy Guido ("Guido"), with the NCPD Sex Crimes Squad, (Tr. 615), denied every receiving a "32B" form or

domestic incident report. (Tr. 616).

Detective Lloyd Doppman ("Doppman"), of the NCPD's Special Victim's Squad, (Tr. 478), testified that when he arrived at the hospital on May 4, 1999, he observed that L.D. was extremely distraught and had "contusion like marks" on her neck and arm. (Tr. 480). At approximately ten twenty-five (10:25) that morning, Doppman received an evidence collection kit from Carol Lyons, a registered nurse at the hospital, (Doppman: Tr. 482; Lyons: Tr. 550), which he subsequently put into the refrigerator at the NCPD's headquarters. (Doppman: Tr. 482).

Doppman testified that he brought L.D. home, where he observed that the telephone in her bedroom had been pulled from the wall and that the receiver had been disconnected from the set. Doppman did not find the tissue that L.D. claimed petitioner had used to wipe himself after the rape. (Tr. 490).

Detective Kevin McCarthy ("McCarthy") of the NCPD's Scientific Investigation Bureau, (Tr. 447-48), testified that he was responsible for collecting and analyzing blood and bodily fluids collected as evidence. (Tr. 448). On December 14, 1999, McCarthy received an evidence collection kit in which the vaginal swabs collected from L.D. tested positive for a prostatic antigen and seminal fluid. (Tr. 452). However, a gray sweat shirt, gray sweat pants and the crotch of L.D.'s underwear tested negative for the prostatic antigen and seminal fluid. (Tr. 474-75.)

On March 15, 2000, McCarthy received the blood specimen collection kit collected from L.D. (Tr. 454). On April 5, 2000, McCarthy sent the DNA samples and petitioner's blood standard card to Laboratory Corporation of America Holdings Incorporated ("LabCorp") for DNA analysis. (Tr. 455). Megan Clement ("Clement"), a lab technician at LabCorp trained in DNA analysis, (Tr. 641-642), testified that she received the evidence kit from McCarthy, copied the

4

originals, returned the originals to McCarthy and tested the copies with a polymerase chain reaction ("PCR") DNA analysis. (Tr. 648, 652). The sperm fraction of DNA in the copies Clement tested matched the DNA sample from petitioner's blood sample. (Tr. 665). Clement testified that based on the DNA evidence, petitioner's DNA could not be excluded from L.D.'s vaginal swabs. (Tr. 670-71). Clement further testified that "[t]he probability of randomly selecting an unrelated person that has a profile matching the major profile in the sperm fraction is approximately one [1] in six hundred and thirty eight million [638,000,000] for the African American population and one [1] in greater than six billion [> 6,000,000,000] for the Caucasian and the Hispanic populations." (Tr. 672). In addition, Clement testified that PCR analysis, as opposed to the older RFLP technology, was more susceptible to contamination, i.e., the introduction of foreign DNA from human sources that was not present in the original samples. (Tr. 675, 685). However, according to Clement, contamination would only affect a statistical analysis if the technician could not distinguish between the major and minor DNA profiles. (Tr. 682).

Doctor Gerard Catanese ("Catanese"), a medical examiner for Nassau and Suffolk counties, (Tr. 571), testified as an expert in the vaginal area of victims, particularly familiar with the effect of the menstrual cycle on the genitalia. (Tr. 554, 556). Catanese testified that in rape cases, he looks first for trauma in the vaginal area of a female victim, then, absent any trauma, at the age, sexual maturity and level of sexual activity of the victim. (Tr. 557). Catanese never examined L.D., but testified that he had read her medical records which did not indicate any trauma to her vulva or vagina. (Tr. 559-560, 563, 577-578). However, Catanese further testified that since the presence of menstrual fluid may provide more lubrication during sexual intercourse,

5

menstruation might alleviate any possible physical trauma. (Tr. 576). According to Catanese, since each rape involves different circumstances, resisting rape may or may not have resulted in more trauma to L.D.'s body. (Tr. 562). Based upon L.D.'s medical report, Catanese could not ascertain whether or not she had been raped. (Tr. 560, 579).

Catanese further testified that a raspy or sore throat and hoarse voice are evidence consistent with someone having been choked. (Tr. 573).

### 2.     The Defense

Petitioner testified that on the night of May 3, 1999, he got into an argument with L.D. because she had "disrespected him" and made him angry; that L.D. stormed to her bedroom following that argument; that he later went to her bedroom to check that she was not sleeping with the lights and television on; that L.D. awoke when he turned the television off and yelled at him to get out of her room; that they then started arguing again; that during the argument in her bedroom, L.D. swung at him and hit him with the phone; that they then "struggle[d]" while he tried to restrain her; that during the struggle on a hardwood floor, L.D., who was just wearing socks, fell to the floor and petitioner, who was also wearing socks, ended up on top of her; and that he had grabbed L.D.'s arm and wrist to stop her from hitting him. (Tr. 766-767, 770-771, 774-777, 791-792). Petitioner testified that the bruises on L.D.'s body occurred during the "scuffle." (Tr. 770). He further testified: "What I call a scuffle is when somebody is charging at you like a bull with a phone and screaming out of their head like they're going crazy." (Tr. 785). Petitioner did not believe that his hands ever contacted L.D.'s neck, (Tr. 792), and claimed that the injury to L.D.'s neck was caused by a necklace with "round things" that she had been wearing. (Tr. 792).

6

According to petitioner, L.D. weighed over two hundred (200) pounds and was very strong. (Tr. 770). Moreover, since he had injured his hand earlier in the day and it was swollen, (Tr. 766), he had been attempting to restrain L.D. with just his uninjured right hand. (Tr. 770).

Petitioner testified that after the "scuffle," L.D. said that she was leaving because she was tired of dealing with the stuff in the house and demanded that he tell her mother what happened or she would. (Tr. 767, 779). According to petitioner, he called his wife and told her that he and L.D. had gotten into an argument and scuffled. (Tr. 779). Petitioner testified that he went to his wife's job at about one o'clock (1:00) the next morning. (Tr. 780).

Petitioner testified that no sexual intercourse between himself and L.D. occurred before she left the home. (Tr. 767-68). According to petitioner, L.D. knew that his penis was not circumcised because he slept with his wife in the nude and, therefore, L.D. likely had seen him naked. (Tr. 772).

### 3. Verdict and Sentence

The jury found petitioner guilty of one (1) count of rape in the first degree in violation of New York Penal Law § 130.35(1) and one (1) count of sexual abuse in the first degree in violation of New York Penal Law § 130.65(1). On March 14, 2001, petitioner was sentenced, as a second felony offender[1], to concurrent determinate terms of imprisonment of eighteen (18) years and

---

[1] The trial court's adjudication of petitioner as a second felony offender was based upon petitioner's April 22, 1991 conviction of robbery in the third degree, which was affirmed on direct appeal. People v. Pruitt, 198 A.D.2d 529, 605 N.Y.S.2d 925 (App. Div. 2d Dept., Nov. 29, 1993). The New York State Court of Appeals denied petitioner's application for leave to appeal from the November 29, 1993 order of the Appellate Division. People v. Pruitt, 82 N.Y.2d 929, 610 N.Y.S.2d 181, 632 N.E.2d 491 (1994).

seven (7) years, respectively.

B.     Procedural Background

On July 12, 2004, petitioner filed a petition for a writ of habeas corpus pursuant to 28

U.S.C. § 2254 in this Court ("the 2004 habeas proceeding"), which was assigned to the Honorable

Denis R. Hurley under docket number CV-04-2913, alleging: (1) that his appellate counsel was

ineffective due to his inordinate delay in perfecting petitioner's direct appeal from his judgment of

conviction; (2) that he was deprived of a fair trial because he was shackled during his testimony at

trial; and (3) that he was denied exculpatory evidence insofar as the initial domestic incident

report containing L.D.'s statements was either lost or destroyed.  By order dated July 24, 2004,

Judge Hurley dismissed the petition based upon, *inter alia*, petitioner's failure to exhaust his state

court remedies and denied petitioner a certificate of appealability.  Pruitt v. Miller, No. 04-CV-

2913 (E.D.N.Y. July 27, 2004).  By mandate entered February 16, 2005, the United States Court

of Appeals for the Second Circuit granted petitioner's application for a certificate of appealability

for the purpose of remanding the proceeding to this Court for further development of the record.

Pruitt v. Muller, No. 04-4273-PR (2d Cir. Jan 13, 2005).

By order entered April 11, 2005, Judge Hurley closed the 2004 habeas proceeding on the

basis that the Supreme Court of the State of New York, Appellate Division, Second Judicial

Department ("Appellate Division") had assigned new counsel to perfect petitioner's direct appeal

and that the newly-assigned appellate counsel was pursuing the appeal.  Judge Hurley further

ruled that petitioner could file a new habeas corpus petition in federal court upon exhaustion of

his state court remedies and that any such new petition would not be considered a successive

8

petition. Pruitt v. Miller, No. 04-4273-PR (2d Cir. Jan. 13, 2005).

On his direct appeal to the Appellate Division, petitioner raised the following claims: (1) that his conviction was not supported by legally sufficient evidence and that the verdict was against the weight of the evidence; (2) that the trial court improperly permitted Catanese to testify concerning the physical manifestations of choking and rape; (3) that the trial court's Sandoval ruling was an improper exercise of discretion, (4) that the trial court improperly excluded certain evidence proffered by the defense; (5) that he was deprived of a fair trial and his right to counsel by being shackled during his testimony at trial; and (6) that he was improperly adjudicated a second felony offender because his prior robbery conviction arose from a violation of his right to confront a witness. On April 11, 2006, the Appellate Division affirmed petitioner's judgment of conviction, finding: (1) that the evidence was legally sufficient to establish his guilt beyond a reasonable doubt and that the verdict was not against the weight of the evidence; (2) that the trial court properly admitted Catanese's testimony; (3) that the trial court's Sandoval ruling was a provident exercise of its discretion; (4) that petitioner was not "unduly prejudiced" by the fact that he was shackled during his testimony; and (5) that petitioner's remaining contentions were without merit. People v. Pruitt, 28 A.D.3d 588, 813 N.Y.S.2d 201 (App. Div., 2d Dept. 2006). On June 23, 2006, the New York State Court of Appeals denied petitioner leave to appeal the April 11, 2006 order of the Appellate Division. People v. Pruitt, 7 N.Y.3d 761, 819 N.Y.S.2d 887, 853 N.E.2d 887 (2006).

On December 11, 2006, petitioner sought in the Appellate Division a writ of error coram nobis to vacate the April 11, 2006 order on the basis that his appellate counsel was ineffective for failing to assert two (2) claims on his direct appeal: (1) a claim challenging the trial court's

determination to allow L.D.'s medical records to be redacted and (2) a claim that petitioner had been denied the effective assistance of trial counsel because his trial counsel failed to investigate and prepare a possible defense based on a finding that L.D. had a sexually-transmitted disease ("STD"). By order dated February 13, 2007, the Appellate Division denied petitioner's application for a writ of error coram nobis finding that petitioner "failed to establish that he was denied the effective assistance of appellate counsel." People v. Pruitt, 37 A.D.3d 623, 828 N.Y.S.2d 818 (App. Div., 2d Dept. 2007). On June 15, 2007, the New York State Court of Appeals denied petitioner's application for leave to appeal from the February 13, 2007 order of the Appellate Division. People v. Pruitt, 9 N.Y.3d 849, 840 N.Y.S. 2d 776, 872 N.E.2d 889 (2007).

On July 30, 2007, petitioner filed a motion pursuant to Section 440.20 of the New York Criminal Procedure Law ("the 440 motion") to set aside his sentence based upon the trial court's failure during sentencing to expressly impose the period of post-release supervision mandated under state law. On September 20, 2007, the trial court summarily denied petitioner's motion. On February 21, 2008, the Appellate Division denied petitioner's application for leave to appeal from the September 20, 2007 order of the trial court.

On June 27, 2008, petitioner filed the instant petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254, alleging: (1) that he was denied the effective assistance of appellate counsel by his appellate counsel's failure to raise two (2) claims: (a) that the trial court improperly redacted mention of L.D.'s STD from her medical records and (b) that his trial counsel failed to thoroughly investigate and present a defense based upon L.D.'s STD; (2) that he was deprived of a fair trial by being shackled during his testimony at trial; (3) that his sentence was unlawfully

imposed or otherwise invalid as a matter of law because the sentencing court failed to impose a mandatory five (5)-year period of post-release supervision; (4) that the evidence was legally insufficient to establish his guilt beyond a reasonable doubt; (5) that he was deprived of a fair trial by the admission into evidence of Catanese's testimony regarding the physical manifestations of choking and rape; and (6) that he was improperly sentenced as a second felony offender because the prior conviction upon which it was based arose from a violation of his constitutional right to confront a witness.

On August 6, 2008, the trial court resentenced petitioner to concurrent periods of post-release supervision of five (5) years in addition to the concurrent determinate terms of imprisonment previously imposed on March 14, 2001. (Respondent's Aff., 6). By order dated June 29, 2010, the Appellate Division affirmed the resentence, finding: (1) that petitioner's constitutional right to due process had not been violated by the resentencing; (2) that petitioner's contention that New York Correction Law § 601-d (effective June 30, 2008), which authorized the resentencing, constituted an unconstitutional *ex post facto* law was unpreserved for appellate review and, in any event, was without merit; and (3) that petitioner's remaining contentions were without merit. People v. Pruitt, 74 A.D.3d 1366, 903 N.Y.S.2d 239 (App. Div., 2d Dept. 2010). On September 30, 2010, the New York State Court of Appeals denied petitioner's application for leave to appeal the June 29, 2010 order of the Appellate Division with leave to renew within thirty (30) days after that court rendered a decision in four (4) related cases.[2] People v. Pruitt, 15

---

[2] The New York State Court of Appeals decided those four (4) related cases, as well as two (2) additional related cases, on April 28, 2011. See People v. Lingle, 16 N.Y.3d 621, 926 N.Y.S.2d 4, 949 N.E.2d 952 (2011) (upholding the resentencing of defendants who were resentenced to terms of post-release supervision while they were still serving their originally-imposed sentences of imprisonment). Petitioner never renewed his application for leave to appeal to the New York

N.Y.3d 855, 909 N.Y.S.2d 32, 935 N.E.2d 824 (2010).

II.    Discussion

A.    Appointment of Counsel

"There is no constitutional right to representation by counsel in habeas corpus proceedings." Green v. Abrams, 984 F.2d 41 (2d Cir. 1993) (internal quotations and citation omitted). Appointment of counsel in habeas corpus proceedings is governed by 18 U.S.C. § 3006A(a)(2)(B), which provides in relevant part that whenever the district court "determines that the interests of justice so require, representation may be provided for any financially eligible person who - * * * is seeking relief under section * * * 2254 * * * of title 28." Although Rules 6(a) and 8(c) of the Rules Governing Section 2254 Cases in the United States District Courts (the Habeas Corpus Rules) provide that an attorney must be appointed for a petitioner who otherwise qualifies to have counsel appointed under § 3006A "[i]f necessary for effective discovery," and "[i]f an evidentiary hearing is warranted," respectively, the appointment of counsel at any other stage of a habeas corpus proceeding is discretionary. See Cruz v. Smith, No. 05 Civ. 10703, 2007 WL 80865, at *1 (S.D.N.Y. Jan. 10, 2007); Curry v. People of State of New York, No. 04 CV 1263, 2005 WL 486845, at *5 (E.D.N.Y. Jan. 4, 2005).

A request for the appointment of counsel in a habeas corpus proceeding is analyzed in the same manner as any other application for the appointment of counsel in civil cases. See Curry, 2005 WL 486845, at *5. When deciding whether to assign counsel to an indigent civil litigant

State Court of Appeal from the June 29, 2010 order of the Appellate Division in accordance with that court's September 30, 2010 order.

under 28 U.S.C. § 1915(e)(1) the threshold inquiry is whether there is "some likelihood of merit" to the litigant's position. Johnston v. Maha, 606 F.3d 39, 41 (2d Cir. 2010) (quoting Cooper v. A. Sargenti Co., 877 F.2d 170, 174 (2d Cir. 1989)); see also Leftridge v. Connecticut State Trooper Officer No. 1283, 640 F.3d 62, 68-9 (2d Cir. 2011) (holding that a motion for appointment of counsel is properly denied if the litigant's "chances of success are highly dubious."); Hodge v. Police Officers, 802 F.2d 58, 61 (2d Cir. 1986) (holding that the district judge should first determine whether the indigent's position seems likely to be of substance). "[C]ounsel should not be appointed in a case where the merits of the indigent's claim are thin and his chances of prevailing are therefore poor." Carmona v. U.S. Bureau of Prisons, 243 F.3d 629, 632 (2d Cir. 2001).

If the Court finds that the plaintiff's claim is of substance, it should next consider the following factors:

> "[T]he indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination."

Hodge, 802 F.2d at 61-62; see also Carmona 243 F.3d at 632 (holding that only after an initial finding that a claim is likely one of substance should the court consider secondary factors such as the factual and legal complexity of the case, the ability of the litigant to navigate the legal minefield unassisted, and any other reason why in the particular case appointment of counsel would more probably lead to a just resolution of the dispute). However, those factors are not restrictive and "[e]ach case must be decided on its own facts." Hodge, 802 F.2d at 61.

13

The appointment of counsel is not warranted in this case since, *inter alia*: (1) petitioner's claims are without merit; (2) petitioner has either adequately and competently set forth his claims in his petition or referred to his appellate brief, prepared by counsel, in support of his claims; (3) the legal issues presented in this proceeding are not particularly complex; and (4) there is no special reason to appoint counsel. Accordingly, petitioner's request for the appointment of counsel is denied.

### B.    Procedurally Defaulted Claim

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. §2254, governs petitions of incarcerated state court defendants seeking federal habeas corpus relief. The AEDPA requires that prior to bringing a petition for habeas corpus relief in federal court, a petitioner "must exhaust the remedies available in state court or demonstrate that 'there is an absence of available State corrective process [or that] circumstances exist that render such process ineffective to protect the rights of the [prisoner].'" Fama v. Commissioner of Correctional Services, 235 F.3d 804, 808 (2d Cir. 2000) (citing 28 U.S.C. §2254(b)(1)). In order to fulfill the exhaustion requirement, a petitioner must "fairly present" to the highest state court "both the factual and legal premises of the claims he asserts in federal court." Baldwin v. Reese, 541 U.S. 27, 32, 124 S. Ct. 1347, 158 L. Ed. 2d 64 (2004); see also Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011); Ramirez v. Attorney General for the State of New York, 280 F.3d 87, 96 (2d Cir. 2001) (noting that "the factual basis for an ineffective assistance claim must, like other issues, be presented to all relevant state courts").

All of petitioner's claims are exhausted, with the exception of his claim that the trial court's determination to shackle him during his testimony at trial was improper because it was based solely "on the unsworn testimony of the court officers without any objective demonstration that petitioner was or had been violent." (Pet. at 4). Petitioner did not raise that claim on his direct appeal and New York Criminal Procedure Law § 440.10(2)(c) precludes him from now seeking collateral review of that claim in state court.

Although this Court may deem petitioner's claim exhausted in light of the absence of any "available State corrective process," 28 U.S.C. § 2254(b)(1)(b)(i), it must also deem the claim to be "procedurally defaulted." Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001); see also Carvajal, 633 F.3d at 104. In order to raise such a procedurally defaulted claim, the petitioner must show cause for his procedural default in state court and actual prejudice resulting from the alleged violation of federal law, or that a failure to consider the claim will result in a "fundamental miscarriage of justice," i.e., that he is actually innocent of the crime for which he was convicted. Coleman v. Thompson, 501 U.S. 722, 750, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991); see also Carvajal, 633 F.3d at 104.

Since petitioner has not demonstrated cause for his failure to raise in state court his claim that the trial court improperly relied solely on the unsworn testimony of the court officers in rendering its decision to shackle him or actual prejudice, and he has not established his actual innocence of the crimes for which he was convicted, that claim is dismissed as procedurally defaulted.

C.    Claims Decided on the Merits

1.    Standard of Review

Pursuant to 28 U.S.C. § 2254(d) an application for a writ of habeas corpus that has met the procedural requirements of the AEDPA must be denied:

> "unless the adjudication of the claim-- (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d).  "An adjudication on the merits is one that (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment." Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (internal quotations and citation omitted); accord Spears v. Greiner, 459 F.3d 200, 203 (2d Cir. 2006).

The Supreme Court has made it clear that "[a]s amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." Harrington v. Richter, 562 U.S. ---, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5, 99 S. Ct. 2781, 2795 n.5, 61 L. Ed. 2d 560 (1979) (Stephens J., concurring)).  A state court's "unreasonable application" of law must have been more than "incorrect or erroneous;" it must have been "objectively unreasonable." Sellan v. Kuhlman, 261 F.3d 303, 315 (2d Cir. 2001) (quotations and citation omitted); see also Gilchrist v. O'Keefe, 260 F.3d 87, 93 (2d Cir. 2001).

Claims that were not adjudicated on the merits in state court are not subject to the deferential standard that applies under AEDPA. See, e.g., Cone v. Bell, --- U.S. ---, ---, 129 S. Ct. 1769, 1784, 173 L. Ed .2d 701 (2009) (citing 28 U.S.C. § 2254(d)). But where AEDPA's deferential standard of review does apply, the "state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence." Bierenbaum v. Graham, 607 F.3d 36, 48 (2d Cir. 2010) (citing 28 U.S.C. § 2254(e)(1)). Under AEDPA's deferential standard of review, "'[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings.'" Cullen v. Pinholster, --- U.S. ---, 131 S. Ct. 1388, 1401, 179 L. Ed. 2d 557 (2011) (quoting Williams v. Taylor, 529 U.S. 420, 437, 120 S. Ct. 1495, 146 L.Ed.2d 435 (2000)).

### 2. Ineffective Assistance of Counsel

Petitioner contends that his appellate counsel was ineffective for failing to raise two (2) claims: (1) that his trial counsel was ineffective for failing to present and investigate a defense that L.D. had an STD; and (2) that the trial court erred in allowing L.D.'s medical records to be redacted. The Appellate Division summarily denied petitioner's coram nobis petition on the basis of Jones v. Barnes, 463 U.S. 745, 751, 103 S. Ct. 3308, 77 L. Ed. 2d 987 (1983), which holds that appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by the defendant.

The Supreme Court has held that "where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing that there was no

reasonable basis for the state court to deny relief." <u>Harrington</u>, 562 U.S., at ___, 131 S. Ct. at

784; <u>see also</u> <u>Watson v. Green</u>, 640 F.3d 501, 511 (2d Cir. 2011).

> "When a federal claim has been presented to a state court and the state court has
> denied relief, it may be presumed that the state court adjudicated the claim on the
> merits in the absence of any indication of state-law procedural principles to the
> contrary. * * * § 2254(d) does not require a state court to give reasons before its
> decision can be deemed to have been 'adjudicated on the merits.'"

<u>Harrington</u>, 562 U.S., at —, 131 S.Ct. at 784-785.

The AEDPA's "difficult to meet," <u>Harrington</u>, 562 U.S. at ---, 131 S. Ct. at 786, and

"highly deferential standard * * * demands that state-court decisions be given the benefit of the

doubt," <u>Woodford v. Visciotti</u>, 537 U.S. 19, 24, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002) (internal

quotations and citation omitted); <u>see</u> <u>Cullen</u> — U.S. —, 131 S. Ct. at 1398. "A state court's

determination that a claim lacks merit precludes federal habeas review so long as 'fairminded

jurists could disagree' on the correctness of the state court's decision." <u>Harrington</u>, 562 U.S. at

—, 131 S. Ct. at 786 (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 65, 664, 124 S. Ct. 2140, 158 L.

Ed. 2d 938 (2004)). "Under § 2254(d), a habeas court must determine what arguments or theories

supported or * * * could have supported, the state court's decision; and then it must ask whether it

is possible fairminded jurists could disagree that those arguments or theories are inconsistent with

the holding in a prior decision of [the Supreme] Court." <u>Id.</u>

In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, a

petitioner must prove both: (1) that counsel's representation "fell below an objective standard of

reasonableness" measured against "prevailing professional norms;" and (2) that "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." <u>Strickland v. Washington</u>, 466 U.S. 668, 694, 104 S. Ct. 2052,

20687-68, 80 L. Ed. 2d 674 (1984); see also Padilla v. Kentucky, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010). Although originally formulated for ineffective assistance of trial claims, the two (2)-prong Strickland test has since been extended to ineffective assistance of appellate counsel claims. See Smith v. Robbins, 528 U.S. 259, 285-86, 120 S. Ct. 746, 764-65, 145 L. Ed. 2d 756 (2000); Clark v. Stinson, 214 F.3d 315, 321 (2d Cir. 2000).

On habeas review of an ineffective assistance of counsel claim, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Harrington, 562 U.S. —, 131 S. Ct. at 785; see also Byrd v. Evans, 420 Fed. Appx. 28 (2d Cir. Mar. 21, 2011). The AEDPA requires federal courts to give state courts "deference and latitude" when considering an ineffective assistance of counsel claim on habeas review. Harrington, 562 U.S. —, 131 S. Ct. at 786. Review of a state court's rejection of an ineffective assistance of counsel claim is "doubly deferential," Knowles v. Mirzayance, 556 U.S. 111, 129 S. Ct. 1411, 1420, 173 L.Ed.2d 251 (2009), i.e., the court must "take a 'highly deferential' look at counsel's performance, Strickland, supra, at 689, 104 S. Ct. 2052, through the 'deferential lens of § 2254(d),' Knowles, supra, at ---, n.2, 129 S. Ct. at 1419, n.2." Cullen, 131 S. Ct. at 1403. Thus, in order to prevail on his ineffective assistance of counsel claim, petitioner must demonstrate that it was "necessarily unreasonable" for the state court to conclude: "(1) that he had not overcome the strong presumption of competence; and (2) that he had failed to undermine confidence in the [jury's verdict and his sentence]." Cullen, 131 S. Ct. at 1403.

a.    Reasonableness of Counsel's Performance

A petitioner must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonably professional assistance." Knowles, 556 U.S. 111, 129 S. Ct. at 1420; see also Cullen, 131 S. Ct. at 1403. This presumption may only be rebutted by demonstrating that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance." Strickland, 466 U.S. at 690, 104 S. Ct. 2052; see also Cullen, 131 S. Ct. at 1403.

"[C]onstitutionally inadequate performance" of counsel may be shown by demonstrating that counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994); see also Ramchair v. Conway, 601 F.3d 66, 76-77 (2d Cir. 2010). However, a petitioner may not rebut the presumption of effective assistance by simply arguing that appellate counsel's decision to raise certain issues and not others constitutes ineffectiveness. See Strickland, 466 U.S. at 689, 104 S. Ct. 2052. Appellate counsel is not required to "press nonfrivolous points * * * if counsel, as a matter of professional judgment, decides not to present those points." Jones, 463 U.S. at 751, 103 S. Ct. 3308; see also Knowles, 556 U.S. —, 129 S. Ct. at 1422 ("The law does not require counsel to raise every available nonfrivolous defense").

> "When a claim of ineffective assistance of counsel is based on failure to raise viable issues, the district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal. Significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome."

Mayo, 13 F.3d at 533 (quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir. 1985)). "For judges to

second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the goal of vigorous and effective advocacy * * * ." Jones, 463 U.S. at 754, 103 S. Ct. 3308; see also Sellan, 261 F.3d at 317 (internal quotations omitted) (holding that the "process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.")

By citing to Jones, 463 U.S. at 745, 103 S. Ct. 3308, in its summary disposition of petitioner's coram nobis petition, the Appellate Division "invoked the correct legal principle at issue." Clark, 214 F.3d at 322. Accordingly, habeas relief is only warranted on petitioner's ineffective assistance of appellate counsel claim if the Appellate Division unreasonably applied Jones or if its decision was based upon an unreasonable determination of the facts.

The Appellate Division reasonably determined that appellate counsel's representation did not fall below an objective standard of reasonableness under prevailing professional norms. Appellate counsel filed a fifty (50)-page brief on behalf of petitioner in the Appellate Division, see Respondent's Ex. 9; clearly and concisely summarized approximately eight hundred eighty-five (885) pages of trial transcripts; raised six (6) colorable legal claims supported by relevant case law; timely applied for leave to appeal to the New York Court of Appeals from the Appellate Division's denial of petitioner's direct appeal; and submitted a twelve (12)-page letter to that court highlighting the reasons why review from the highest state court was appropriate. See Respondent's Ex. 12. See, e.g. United States v. DiPaolo, 804 F.2d 225, 234–35 (2d Cir. 1986) (holding that defendants were not denied the effective assistance of counsel where counsel appeared well- prepared and to have a good understanding of the facts and legal principles

21

involved in the case); <u>Gonzales v. United States</u>, 337 F. Supp. 2d 419, 423 (E.D.N.Y. 2004) ("So long as the challenged attorney is prepared with relevant facts and appropriate legal standards, strategic decisions regarding the challenging of evidence * * * cannot be second-guessed in an effort to support an ineffective assistance of counsel claim").[3]

Since the Appellate Division's determination was not contrary to, or an unreasonable application of, <u>Jones</u>, and was not based upon an unreasonable determination of the facts in this case, petitioner's ineffective assistance of counsel claim is denied.


### 3.    Restraint of Petitioner During Trial

Prior to petitioner's testimony at trial, the prosecution moved to have him physically restrained throughout the proceedings based upon complaints from court officers. Specifically, Court Officer Matthew Grover ("Grover") indicated on the record that while he was transporting petitioner back to a holding pen during a court recess, petitioner refused his instruction to turn and face the back of the elevator; became loud and abusive; and cursed the court officers escorting him. (Tr. 746). Court Officer Hartman ("Hartman") then put his hand on petitioner's shoulder to direct him to face the back wall of the elevator, at which time petitioner began to throw his body weight around the elevator. (Tr. 747). According to Hartman, he did not put petitioner's face against the wall. (Tr. 747). When the court officers tried to restrain petitioner, he threw the

---

[3] In light of this determination, it is unnecessary to consider the prejudice-prong of <u>Strickland</u>. <u>See</u> <u>Greiner v. Wells</u>, 417 F.3d 305, 319 (2d Cir. 2005) ("There is no reason for a court deciding an ineffective assistance claim. . . to address both components of the [<u>Strickland</u>] inquiry if the defendant makes an insufficient showing on one." (internal quotations, citation and alterations omitted)); <u>see also</u> <u>United States v. Guang</u>, 511 F.3d 110, 120 (2d Cir. 2007) (declining to address the reasonableness-prong of <u>Strickland</u> because the defendants did not establish the prejudice-prong).

officers around the elevator, as a result of which Grover banged his elbow and Hartman sustained

a cut on his elbow. (Tr. 747). According to Grover, petitioner then claimed that the officers

jumped him because he was handcuffed and that the situation would be different if he were not

handcuffed. (Tr. 747). According to Hartman, petitioner said that as soon as he got the handcuffs

off, he would "break [the officers] down like a cheap shotgun." (Tr. 747).

Sergeant Scalisi testified that a similar situation occurred when he transported petitioner a

second time. (Tr. 748). Specifically, petitioner took a diagonal position in the elevator instead of

facing the back wall and made threats against the officers. (Id.)

When defense counsel objected to petitioner being handcuffed in front of the jury, the

following colloquy took place:

> [PETITIONER]: Leave the cuffs on and have a mistrial, I have no problem with it.
>
> THE COURT: What's that?
>
> [PETITIONER]: I'll just ask for a mistrial. He knows the jury cannot see me in no cuffs.
>
> THE COURT: They can if necessary. Let me tell you something. If, you know, you can understand yourself, if someone gets out of hand, naturally they can be restrained.
>
> [PETITIONER]: I expect for you to believe your fellow officers over me, because why I'm a prisoner. You understand what I'm saying? Just like your ruling on everything else, I expect for you to go along with them. I don't expect nothing different.
>
> THE COURT: Well, all right.
>
> * * *
>
> THE COURT: I am not making an ultimate decision on that. But there is a basis for me to believe that the officers are concerned with the safety in the courtroom. And that doesn't have to be proven beyond a reasonable doubt. That's just

23

something that if they voice a concern, they're authorized by me to take whatever steps are necessary.

THE COURT: * * * I'm going to take the recommendation of the court officers. I'm not going to – I'm not going to rule on that at this point. I see [petitioner] is relatively calm at this point. I'm not going to – I'm not going to rule on that until I speak with them further on it.

(Tr. 749-51).

The trial court then elicited a recommendation from Major Fierro ("Fierro"), the head of security at the courthouse. Fierro recommended, based upon petitioner's actions in the elevator as indicated by Harman, Grover and Scalisi, that the trial court keep petitioner handcuffed during the remainder of the proceedings for the safety of the court officers and the other personnel in the courtroom. (Tr. 752). The trial court also spoke with Grover and Hartman again regarding the threats they heard from petitioner to the effect that he would "break [the officers] down." (Tr. 756, 758).

The trial court then ruled that during his testimony, petitioner would remain in handcuffs connected to his waistband in front of him. (Tr. 758). The following colloquy occurred next:

THE COURT: In order to mitigate the jurors attention to [the restraints], the table at which [petitioner] [is] seated has a paper wrapping around it so that the [petitioner's] waist and hands are not visible to the jurors. The table has been pushed back at an angle so that the hands are not visible to the jurors.

[PETITIONER]: This is right here. This is a violation of my rights. This is a violation, you know this.

THE COURT: I don't believe it is, based on your behavior.

[PETITIONER]: Judge –

THE COURT: You know, when I'm speaking, don't interrupt me or you will be removed.

24

[PETITIONER]: Remove me, Judge. Remove me. You're violating my rights. All right, remove me Judge.

THE COURT: I will. Be quiet. I'm advising you, if you interrupt me and shout and continue to shout and interrupt me, you will be removed from the courtroom.

[PETITIONER]: What else I got to worry about? You take the assumption of what the officers say on face value. What else you doing to me?

THE COURT: Let the record indicate, while [petitioner] is seated at the table, he can keep his hands down so that they are not visible to the jurors. He is at times picking his hands up and then – I cannot see the cuffs, but let's assume that – with his hands up, the jurors may be able to see that. I have put the microphone at the defense table and we'll proceed. If you choose, [petitioner], you can sit forward, keep your hands down, and the jurors will not be able to see that you are, indeed, cuffed. The record should indicate that he is cuffed in the front with a device securing his hands to his waist.

(Tr. 759-60).

After petitioner indicated that the jury box was higher than the regular floor, (Tr. 760), defense counsel sat in the jury box and indicated that he could see the top of petitioner's cuffs unless petitioner leaned forward to speak into the microphone. (Tr. 761). The court directed that a box be strategically placed to block the jurors' view of petitioner's hands even when he sat back. (Id.) The trial court overruled defense counsel's objections to the whole setup, citing the precautions taken to prevent the jury from seeing the handcuffs. (Tr. 761). In addition, the trial court instructed the jury to ignore the changes made to the courtroom and not to speculate about them. (Tr. 763).

Petitioner alleges, *inter alia*, that he was denied a fair trial by the trial court's determination to shackle him during his testimony. Pet. at 4. The Appellate Division rejected petitioner's contentions on direct appeal from his judgment of conviction, finding that he was not unduly prejudiced because his waist and hands were not visible to the jurors; it was his own

violent behavior that made it necessary to shackle him; and the trial court minimized any potential prejudice by issuing an appropriate instruction to the jury. People v. Pruitt, 28 A.D.3d 588, 813 N.Y.S.2d 210 (App. Div., 2d Dept. 2006).

At the time of the state court proceedings, federal law held:

> "The trial court has discretion to order physical restraints if the court has found those restraints necessary to maintain safety or security. If manacles and other shackles are not necessary, forcing a party to appear in such restraints may well deprive him of due process. In determining what restraints are necessary, the court cannot properly delegate that decision to guards or other prison officials but must decide that question for itself. If there is a dispute as to the record on which the security questions are to be determined, the court should be willing to receive evidence. The court must impose no greater restraints than are necessary, and it must take steps to minimize the prejudice resulting from the presence of the restraints."

Hameed v. Mann, 57 F.3d 217, 222 (2d Cir. 1995); see also Illinois v. Allen, 397 U.S. 337, 343-44, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (1970) (holding that a trial court has discretion to order the use of physical restraints "as a last resort" to control abusive or violent defendants). If the court has deferred entirely to those guarding the prisoner, or has otherwise abused its discretion, "harmless-error analysis applies," pursuant to which the court must weigh several factors, "including the strength of the case in favor of the prevailing party and what effect the restraints might have had in light of the nature of the issues and the evidence involved in the trial." Hameed, 57 F.3d at 222; see also Davidson v. Riley, 44 F.3d 1118, 1124 (2d Cir. 1995) (holding that harmless-error analysis applies where the trial court impermissibly delegates the decision whether to restrain the defendant to others or has otherwise abused its discretion).

The Supreme Court has since held that although "[t]he law has long forbidden routine use of visible shackles during the guilt phase [of a criminal trial]; it permits a State to shackle a

26

criminal defendant only in the presence of a special need." <u>Deck v. Missouri</u>, 544 U.S. 622, 626,

125 S. Ct. 2007, 161 L. Ed. 2d 953 (2005). "[T]he Fifth and Fourteenth Amendments prohibit the

use of physical restraints visible to the jury absent a trial court determination, in the exercise of its

discretion, that they are justified by a state interest specific to a particular trial. Such a

determination may of course take into account the factors that courts have traditionally relied on

in gauging potential security problems and the risk of escape at trial." <u>Id.</u> at 629, 125 S. Ct. 2007.

Although the trial court may have relied upon the opinions of court officers in assessing

the necessity of physically restraining petitioner, it did not improperly delegate to the officers the

ultimate decision to restrain petitioner. <u>See, e.g.</u> <u>DeLeon v. Strack</u>, 234 F.3d 84, 88 (2d Cir. 2000)

(finding that the state trial judge did not appear to have improperly delegated to corrections

officials the decision whether to restrain the petitioner where he clearly indicated an intention to

maintain security and to assure the safety of everyone in the courtroom, simply relied on the

opinion of a corrections officer as to the particular form of restraint to be used and made the

ultimate judgment as to whether to apply the suggested restraint). Rather, the record shows that

following reports from three (3) court officers of two (2) security incidents involving petitioner

during his transport from the courtroom, including reports of threats made by petitioner to the

physical safety of those officers and injuries received by two (2) officers during one (1) of the

incidents, the trial court questioned the court officers regarding the facts of those incidents and the

threats reportedly made by petitioner and heard argument from counsel regarding to necessity of

restraining defendant. During the hearing, petitioner repeatedly interrupted the proceedings and

displayed belligerence towards the court. Nonetheless, the trial court initially deferred making the

ultimate determination to restrain petitioner until he had elicited the recommendation of the head

of court security and further questioned the court officers about the threats made to them by petitioner. (Tr. 752-758). Neither petitioner nor his trial counsel ever disputed the veracity of the information provided to the trial court by the court officers. In fact, petitioner admitted to "struggling" with the court officers while he was being transported to the courtroom. (Tr. 744-47).

The trial court then took measures to minimize the visibility of petitioner's restraints to the jury, including wrapping the table at which he sat with paper so that his waist and hands were not visible; pushing the table back at an angle so that his hands were not visible; advising petitioner to sit forward to speak into the microphone and to keep his hands down so that they were not visible to the jury; and placing a box to obstruct the juror's view of petitioner's hands even if he sat back. (Tr. 758-761). In addition, the trial court instructed the jurors to ignore the changes to the courtroom and not to speculate about them. (Tr. 763). Accordingly, the state court's determination was not contrary to, or an unreasonable application, of federal law, nor was it based upon an unreasonable determination of facts in light of the evidence presented.

Even assuming, *arguendo*, that the trial court improperly delegated the responsibility to determine the necessity of physically restraining petitioner to the court officers, the state court's determination was not contrary to, or an unreasonable application of, federal law, nor was it based upon an unreasonable determination of facts in light of the evidence presented. The evidence of petitioner's guilt was overwhelming, petitioner was not proceeding *pro se* in the state court and, therefore, was not required "to parade his restraints before the jury," Hameed, 57 F.3d at 223; the trial court took steps to minimize the visibility of the restraints to the jury; and the trial court gave the jury an appropriate cautionary instruction. See, e.g. United States v. Harper, No. 09-2558-cr,

28

2011 WL 1682001, at * 3 (2d Cir. May 5, 2011) (holding that even assuming error in the district court's decision to restrain the defendant, the error was harmless in light of the measures taken by the court to minimize the chances that his shackling would be visible to the jury and the strength of the case against him). Accordingly, petitioner's claim that he was impermissibly restrained during his testimony is denied.

### 4. Insufficiency of Evidence

When considering the legal sufficiency of the evidence, the court "must look to state law to determine the elements of the crime," Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d. Cir. 2002) (citation omitted); see also Langston v. Smith, 630 F.3d 310, 314 (2d Cir. 2011), and determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319, 99 S. Ct. 2781 (emphasis in original). When challenging the legal sufficiency of the evidence in a state criminal conviction, the petitioner "bears a heavy burden," Ponnapula, 297 F.3d at 179, of "rebutting [by clear and convincing evidence] the presumption that all factual determinations made by the state court were correct." Farrington v. Senkowski, 214 F.3d 237, 241 (2d Cir. 2000) (citing 28 U.S.C. § 2254(e)). Nonetheless, "a conviction based on speculation and surmise alone cannot stand * * * and courts cannot credit inferences within the realm of possibility when those inferences are unreasonable." Langston, 630, F.3d at 314 (quotations and citations omitted).

Under New York law at the time of the offenses for which petitioner was convicted, a person was guilty: (A) of rape in the first degree if "he engage[d] in sexual intercourse with a

female: 1. By forcible compulsion * * *," (N.Y. Penal Law § 130.35(1), effective to Jan. 31,

2001); and (B) of sexual abuse in the first degree if "he subject[ed] another person to sexual

contact: 1. By forcible compulsion * * * ," (N.Y. Penal Law § 130.65(1). effective to Jan. 31

2001).

The Appellate Division's finding that upon "[v]iewing the evidence in the light most

favorable to the prosecution," the evidence "was legally sufficient to establish the defendant's

guilt beyond a reasonable doubt," People v. Pruitt, 28 A.D. 3d 588, 813 N.Y.S. 2d 210 (App. Div.

2006), was not "contrary to or * * * an unreasonable application of clearly established Federal

law," nor was it based upon an unreasonable determination of the facts. There was sufficient

evidence in the record from which a rational juror could have found petitioner guilty of rape in the

first degree and sexual abuse in the first degree under then-existing New York law. Specifically,

*inter alia*: (1) L.D. testified in detail about the commission of the crime; (2) L.D.'s credibility was

established by (a) the absence of any motive to lie, (b) her immediate outcry to three (3) witnesses

who testified consistently at trial and (c) medical evidence of wounds tending to corroborate her

claims; (3) multiple witnesses testified to the presence of wounds on L.D.'s body on the night of

the rape, as well as to her distraught mental state and hoarse voice that night; and (4) DNA

evidence established that petitioner's sperm was found in L.D.'s vagina after the rape.

Accordingly, petitioner's legal insufficiency claim is denied.[4]

---

[4] To the extent petitioner claims that the verdict was against the weight of the evidence, that
claim does not present a  claim cognizable on federal habeas review.  See McKinnon v.
Superintendent, Great Meadow Correctional Facility, No. 08-2828-PR, 2011 WL 2005112, at * 4
(2d Cir. May 24, 2011); Correa v. Duncan, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001).

5.     Evidentiary Claims

Federal habeas review is limited to determining whether a petitioner's custody violates

federal law, see 28 U.S.C. § 2254(a); Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998), and

"does not lie for errors of state law." Wilson v. Corcoran, 131 S. Ct. 13, 16, 178 L. Ed. 2d 276

(2010) (quoting Estelle v. McGuire, 502 U.S. 62, 67, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991)).

As such, challenges to the admissibility of evidence are cognizable on habeas review only if the

petitioner can establish that the decision to admit the evidence rendered the trial so fundamentally

unfair as to deny him or her due process of law. See Dunnigan, 137 F.3d at 125. An erroneous

evidentiary ruling does not amount to a constitutional violation unless the evidence in question

was "so extremely unfair that its admission violate[d] fundamental conceptions of justice." Id.

(citing Dowling v. United States, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 [1990]).

In order to constitute a denial of due process, the prejudicial evidence erroneously admitted "must

have been sufficiently material to provide the basis for conviction or to remove a reasonable doubt

that would have existed on the record without it." Id. (internal quotations and citations omitted).

In short, the erroneously admitted evidence, viewed "in light of the entire record before the jury,"

id., must have been "crucial, critical, highly significant." Collins v. Scully, 755 F.2d 16, 19 (2d

Cir. 1985).


a.     Introduction of Medical Expert Testimony

Petitioner claims that the admission of "opinion evidence deprived [him] of a fair trial."

Pet. at 5. Specifically, petitioner challenges the admission of Catanese's testimony regarding the

physical manifestations of choking and rape. See Respondent's Ex. 8 at 30. The Appellate

Division held that Catanese's testimony was properly admitted "as it was based on his specialized knowledge and was helpful in aiding the jury to reach its verdict." People v. Pruitt, 28 A.D.3d 588, 813 N.Y.S.2d 210 (App. Div. 2d Dept. 2006).

Petitioner has not established any error with respect to the trial court's admission of Catanese's testimony at trial. The trial court has broad discretion under state law to permit the admission of expert testimony at trial "when it would help to clarify an issue calling for professional or technical knowledge, possessed by the expert and beyond the ken of the typical juror." De Long v. County of Erie, 60 N.Y.2d 296, 307, 469 N.Y.S.2d 611, 457 N.E.2d 717 (1983); see also People v. Santi, 3 N.Y.3d 234, 246, 785 N.Y.S.2d 405, 818 N.E.2d 1146 (2004) ("[E]xpert testimony is used to aid a lay jury in reaching a verdict.") Since the physical manifestations of choking and rape are beyond the ken of a layperson, it was not objectively unreasonable for the Appellate Division to conclude that Catanese's testimony was properly admitted under state law.

In any event, Catanese's testimony was not "so substantial, significant or crucial," Collins, 755 F.2d at 19, as to deprive petitioner of a fundamentally fair trial, particularly in light of the other overwhelming evidence of petitioner's guilt. Since the admission of Catanese's testimony, even if erroneous under state law, was not so prejudicial as to deprive petitioner of a fundamentally fair trial, petitioner's claim challenging that evidentiary ruling is denied.

b.    Sandoval Claim

Prior to trial, the trial court conducted a Sandoval hearing to determine whether the prosecutor would be permitted to question petitioner, should he testify at trial, about his previous

convictions of robbery in the third degree in 1991 and resisting arrest in 1995, as well as the underlying facts of the robbery conviction. (Tr. 6). Specifically, with respect to the robbery conviction, the prosecution sought to question petitioner about the fact "that he threatened [the victim] and he had pushed her down and that she refused to give him the money until she acceded to his demands, which she finally did, because he threatened her," or, in the alternative, to ask petitioner if he had been convicted of a felony in 1991. (Tr. 8, 11). According to the prosecutor, he was only seeking to question petitioner about those prior convictions which showed petitioner's willingness to put his own interests above those of society, not all of his prior convictions. (Tr. 12).

In opposition, defense counsel contended that the prior convictions were too remote in time and that allowing the prosecution to question petitioner about the underlying facts of the robbery conviction was too prejudicial to petitioner. (Tr. 14). With respect to the prosecution's alternative request, defense counsel asked that the prosecutor be limited to asking petitioner if he had ever been convicted of a crime, as opposed to a felony. (Tr. 15).

The trial court ruled as follows:

> "THE COURT: * * * with respect to the robbery third, I will – if the defendant testifies * * * permit questions with respect to the conviction of robbery third, that it is a felony, and I will permit the underlying facts as brought out by the assistant district attorney. I believe that the larceny involved reflects directly on credibility, and the probative value outweighs prejudice, and the acts indicate the defendant's willingness to place his own interests above those of society. With respect to the resisting, I will permit on cross-examination him to be asked if he was convicted of resisting arrest in 1995, no underlying facts."

(Tr. 15-16).

33

The prosecutor subsequently cross-examined petitioner at trial in accordance with the trial court's Sandoval ruling, including asking petitioner whether the robbery conviction involved petitioner "forcibly stealing property." (Tr. 773).

Petitioner claims that his constitutional right to due process was violated as a result of the trial court's Sandoval ruling.

"The Sandoval ruling is a matter of state law as to the admissibility of evidence, the purpose of which is to provide the defendant with a prospective ruling on the possible use of defendant's prior bad acts by the prosecution for the purpose of impeachment." Ayala v. Ercole, No. 06-CV-1747, 2007 WL 1135560, at *14 (E.D.N.Y. Apr. 17, 2007). Accordingly, a challenge to a state court's Sandoval ruling is only redressable in a federal habeas corpus proceeding if the petitioner can establish that the prosecutor's use of his prior convictions or bad acts on cross-examination rendered the trial fundamentally unfair. See id. (holding that federal habeas courts are limited to the review of state court convictions where there has been a constitutional error so great that the criminal defendant was denied a fair trial * * * and that a writ of habeas corpus should issue only where the petitioner can show that the evidentiary error deprived him of a fundamentally fair trial); see also Sims v. Ercole, No. 09-cv-4398, 2010 WL 1685434, at * 5 (S.D.N.Y. Apr. 23, 2010) (holding that a Sandoval claim concerns a matter of state evidentiary law and does not pose a federal constitutional issue unless the error deprived the petitioner of fundamental fairness, thereby violating due process).

Petitioner has not established any error with respect to the trial court's Sandoval ruling. The trial court did not abuse its discretion under state law in allowing the prosecution to cross-examine petitioner regarding his prior robbery and resisting arrest convictions since those

convictions were relevant to the issues of petitioner's credibility as a witness and willingness "to place the advancement of his self-interest ahead of principle or of the interests of society." People v. Sandoval, 34 N.Y.2d 371, 357 N.Y.S.2d 849, 314 N.E.2d 413, 417-18 (1974); see People v. Harris, 74 A.D.3d 984, 984-85, 902 N.Y.S.2d 190 (2d Dept. 2010), lv. denied, 15 N.Y.3d 920, 913 N.Y.S.2d 647, 939 N.E.2d 813 (N.Y. 2010) (holding that convictions involving theft, i.e., robbery, are "highly relevant" to the issue of credibility and demonstrate the defendant's willingness to "deliberately further his * * * self-interest at the expense of society); People v. Hunter, 180 A.D.2d 752, 752-53, 580 N.Y.S.2d 387 (2d Dept. 1992) (holding that a prior resisting arrest conviction demonstrated that the defendant placed his own interests above those of society).

In any event, any error in the admission of evidence regarding petitioner's prior convictions did not deprive petitioner of a fundamentally fair trial, particularly in light of the overwhelming evidence of petitioner's guilt. See, e.g. Sims, 2010 WL 1685434, at * 6 (finding that the petitioner was not deprived of a fundamentally fair trial since the evidence of his guilt was substantial); Senor v. Greiner, No. 00-CV-5673, 2002 WL 31102612, at *13 (E.D.N.Y. Sept. 18, 2002) (finding the petitioner's Sandoval claim to be without merit where, inter alia, even assuming the trial court erred in permitting cross examination about petitioner's prior drug conviction, the petitioner failed to demonstrate that the ruling influenced the jury's verdict in any way in light of the abundant evidence of petitioner's guilt). Since the trial court's Sandoval ruling, even if erroneous under state law, was not so prejudicial as to deprive petitioner of a fundamentally fair trial, petitioner's claim challenging that evidentiary ruling is denied.

6. Sentencing Claims

a. Post-Release Supervision Claim

Petitioner contends that his sentence is unlawful because the trial court failed to impose a mandatory period of post-release supervision and allowed the Department of Correctional Services to impose a five (5)-year period of post-release supervision. Pet. at 5.

Since petitioner was resentenced on August 6, 2008, while he was still serving his originally-imposed sentence of imprisonment, to the mandatory periods of post-release supervision in addition to the concurrent terms of imprisonment imposed on his original sentence on March 14, 2001, this claim is now moot. See, e.g. Ridgeway v. Zon, No. 09-4789-cv, 2011 WL 2357311, at * 2 (2d Cir. June 15, 2011). Accordingly, petitioner's unlawful sentence claim is denied.

b. Second Felony Offender Adjudication

In the fourth ground for relief in his petition, petitioner asserts, *inter alia*, a confrontation clause violation and that he was improperly sentenced as a "predicate offender." Pet. at 5. In support of those claims, petitioner refers to his appellate brief, in which he claimed that he was improperly sentenced as a second felony offender based upon his prior robbery conviction because that conviction arose from a violation of his right to confront the witnesses against him, i.e., the defense was unable to obtain the robbery victim's confidential psychiatric records for impeachment purposes. Pet. App. Br. at 45. The Appellate Division denied this claim as lacking merit. People v. Pruitt, 28 A.D.3d 588, 813 N.Y.S.2d 210 (App. Div., 2d Dept. 2006).

36

The Supreme Court has held that "once a state conviction is no longer open to direct or collateral attack in its own right because the defendant failed to pursue those remedies while they were available (or because the defendant did so unsuccessfully), the conviction may be regarded as conclusively valid." Lackawanna County District Attorney v. Coss, 532 U.S. 394, 403, 121 S. Ct. 1567, 1574, 149 L. Ed. 2d 608 (2001) (citing Daniels v. United States, 532 U.S. 374, 382, 121 S. Ct. 1578, 1583, 149 L. Ed. 2d 590 (2001)). Furthermore, with exceptions not relevant here, "[i]f that [prior] conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained." Coss, 532 U.S. at 403-04, 121 S. Ct. 1567; see also Rodriguez v. Conway, NO. 06-CV-6358, 2010 WL 92911, slip op. at *11 (E.D.N.Y. Jan. 06, 2010).

Petitioner's prior robbery conviction is no longer open to direct review or collateral attack because, inter alia: (1) petitioner already appealed his prior conviction to the Appellate Division, albeit unsuccessfully, People v. Pruitt, 198 A.D.2d 529, 605 N.Y.S.2d 925 (App. Div. 2d Dept., Nov. 29, 1993), and the New York State Court of Appeals denied his application for leave to appeal, People v. Pruitt, 82 N.Y.2d 929, 610 N.Y.S.2d 181, 632 N.E.2d 491 (1994); (2) petitioner could have raised his Confrontation Clause claim on direct appeal and, therefore, is precluded by New York Criminal Procedure Law § 440.10(2) from collaterally attacking his prior conviction in state court; and (3) the AEDPA's one (1)-year statute of limitations bars petitioner from seeking federal habeas review of his prior conviction. Accordingly, petitioner's prior conviction is conclusively valid and may not be used to challenge the trial court's adjudication of petitioner as a second felony offender. See Coss, 532 U.S. at 403-04, 121 S. Ct. 1567; Davis v. Nassau County,

524 F.Supp.2d 182, 191-92 (E.D.N.Y. 2007). Thus, petitioner's Confrontation Clause and improper sentence claims are denied.

III.     Certificate of Appealability

As petitioner has failed to make a substantial showing of a violation of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253(c)(1); see also Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003); Contino v. United States, 535 F.3d 124, 127 (2d Cir. 2008). Petitioner has a right to seek a certificate of appealability from the United States Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253.

IV.     Conclusion

The petition is denied in its entirety, the proceeding is dismissed and a certificate of appealability will not issue. The Clerk of the Court is directed to serve notice of entry of this Order on all parties in accordance with Rule 77(d)(1) of the Federal Rules of Civil Procedure, including mailing a copy of the Order to the *pro se* petitioner at his last known address. Fed. R. Civ. P. 5(b)(2)(C), and to close this case.

SO ORDERED.

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: August 9, 2011
        Central Islip, New York